# IN THE SUPREME COURT OF IOWA

No. 17–1732

Filed April 5, 2019

**NATALIE SLAUGHTER,**

Appellant,

vs.

**DES MOINES UNIVERSITY COLLEGE OF OSTEOPATHIC MEDICINE,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Plaintiff appeals summary judgment dismissing claim that medical school failed to accommodate her mental disability and evidentiary ruling declining to impute confidential knowledge of psychotherapist to the school. **AFFIRMED.**

John P. Roehrick of Roehrick Law Firm, P.C., Des Moines, and Bonnie J. Heggen, Ankeny, for appellant.

Kelly R. Baier of Bradley & Riley PC, Cedar Rapids, and Melissa A. Carrington of Bradley & Riley PC, Iowa City, for appellee.

**WATERMAN, Justice.**

In this appeal, we review an evidentiary ruling and summary judgment ending a lawsuit by a student who failed to meet academic requirements in medical school and sued the school for failing to accommodate her mental disability. The student was treated for depression by a staff psychotherapist during the school year but did not give consent to allow the psychotherapist to discuss her depression with the faculty. Nor did the student inform the academic decision-makers of her depression until mid-December, after she had failed a required class and performed poorly on other classes her first semester. Several accommodations were provided or offered, but she failed another required class the second semester and again performed badly on other courses. The medical school expelled her based on her failing grades and lack of academic promise.

The student filed a complaint against the medical school with the Iowa Civil Rights Commission and then filed this district court action alleging the school failed to accommodate her mental disability. She filed an evidentiary motion to impute her psychotherapist's knowledge of her depression to the school's academic decision-makers. The district court applied statutory confidentiality requirements for mental health information to deny her motion, finding the student had not waived the privilege, and granted the school summary judgment on her failure-to-accommodate claim. We retained her appeal.

For the reasons explained below, we hold the district court correctly declined to impute the psychotherapist's knowledge to the medical school's academic decision-makers. We also conclude based on the undisputed facts that the failure-to-accommodate claim failed as a matter of law. The student could not show the medical school denied

any reasonable accommodation she requested or that any reasonable accommodation existed that would have allowed her to meet the school's academic standards. Accordingly, we affirm the district court's evidentiary ruling and summary judgment.

## I. Background Facts and Proceedings.

In August 2014, Natalie Slaughter started her first year of medical school at Des Moines University College of Osteopathic Medicine (DMU). Almost immediately, she struggled academically. Slaughter soon came to the attention of the Academic Progress Committee (APC), a faculty committee that monitors student academic performance and conducts academic disciplinary hearings.

Dr. Donald Matz, chair of the APC, repeatedly warned Slaughter regarding her subpar academic performance, sending her letters on August 25, September 9 and 19, and October 10 and 15. Dr. Matz specifically warned Slaughter that she was in jeopardy of failing one or more of her courses. In each letter, Dr. Matz encouraged Slaughter to seek assistance from her course director, faculty advisor, the Center for Academic Success and Enrichment (CASE), and DMU's student counseling center.

On September 3, Slaughter completed a client intake form at the student counseling center. Slaughter indicated she was seeking help for "high anxiety and trouble falling asleep." During her intake appointment, Slaughter signed a document titled "Client Rights, Responsibilities, and Informed Consent." One of the client rights was "[t]o know that personal information cannot be disclosed to anyone, except for professional consultation or supervision, without your specific, written permission." Slaughter underwent weekly counseling sessions with Dr. Emily Sanders, a staff psychologist employed by DMU, from

September 9 until June 2015. During these sessions, Slaughter discussed her history of depression and anxiety and often reported feeling worried and depressed because of her bad performance on tests. Slaughter did not give Dr. Sanders permission to discuss her case with DMU's faculty or administrators.

Meanwhile, on September 10, Slaughter completed an intake form at CASE indicating she "would like to find a study strategy that works best for [her]." She did not disclose her depression on the intake form. CASE provided Slaughter with time management strategies, electronic study resources, and one-on-one tutoring. Slaughter claims she talked to someone at CASE about the depressive symptoms she was experiencing and how those symptoms affected her academics, though she could not remember the person's name. Slaughter also claims she discussed her depression with a student tutor from CASE.

On September 20, Slaughter emailed her faculty advisor, Shelley Oren, about her unsuccessful performance on the second biochemistry test. Slaughter and Oren continued to communicate, both in person and by email, throughout the semester. Slaughter did not disclose her depression to Oren.

On September 26, Dr. Matz met with Slaughter to discuss her poor performance in Gross Anatomy and Clinical Medicine. He gave Slaughter tips for labeling anatomical drawings to help her study for class. During this meeting, Dr. Matz encouraged Slaughter to utilize resources available at CASE.

At the end of the fall semester, Slaughter failed her biochemistry course and performed badly in Gross Anatomy and Clinical Medicine. On December 16, Slaughter met with the APC to discuss ways to improve her academic performance and to discuss her academic status. During

this meeting, Slaughter was asked to describe her study habits. Slaughter indicated she preferred to watch lectures online instead of attending class in person. Slaughter stated she studied six to eight hours per day, but she was an English undergraduate major and was uncomfortable taking multiple-choice tests. Slaughter did not tell the APC that she was experiencing depression. She stated that she was sick before her first biochemistry examination and that she had trouble sleeping the night before tests. During this meeting, Slaughter was told about the Extended Pathways to Success Program, a program that allows students who are struggling with DMU's traditional four-year program to take fewer courses each semester and complete their coursework in five years.

The following day, Slaughter met with Oren to discuss the APC meeting and the Extended Pathways Program in more detail. During this meeting, Slaughter disclosed for the first time that she was experiencing depression and did not believe she could handle a fifth year of medical school. Slaughter and Oren dispute whether Slaughter had described her symptoms, such as difficulty falling asleep and nervousness, to Oren earlier in the semester. Slaughter declined Oren's request for permission to speak directly with Dr. Matz. Instead, Slaughter promptly that day emailed Dr. Matz disclosing her depression, stating,

> [A]t the beginning of the semester I had some personal difficulties that I didn't entirely feel comfortable sharing in such a large setting. I have struggled with depression for a very long time, and at the beginning of the semester I had a horrible relapse of sorts. My normally well controlled disorder ended up severely affecting my life in ways it hasn't in many years. I was barely making it through the day without breaking down, and all the emotional energy it took for me to save face at school was so exhausting that by the time I would get home I had difficulty focusing on my coursework. I was extremely demoralized because of doing poorly it just ended up as this vicious cycle. There would be

days where I couldn't get anything done and then I would get really behind, then crammed right before the test, do poorly, and then go right back into depression. I started seeing a therapist when I was about half of the way through biochem and as I have been working with her my mood has improved, making it easier for me to focus on school.

Slaughter also expressed her preference not to enter the Extended Pathways to Success Program:

My fear is that stretching [the program] out in a longer period of time would be extremely detrimental for my mental health, I know I can handle this type of environment for another 3 semesters, but adding on a whole year would be devastating and I fear greatly that I would end up being severely depressed. I really want you to know that my resistance of going to the 5 year plan isn't out of stubbornness or pride, but out of self-preservation. I truly believe that this option would not be beneficial to me at all and instead would be harmful, because my issue is finding the tools that work best for me and getting my depression under control, which would be hindered.

Dr. Matz responded to Slaughter's email within fifteen minutes, stating that he appreciated her sharing that information and that the APC "want[ed her] to succeed." Dr. Matz did not share Slaughter's email or any information about Slaughter's depression with the APC.

On December 18, Dr. Matz wrote to Slaughter to inform her that the APC had decided to place her on academic probation. As a standard term of that probation, Slaughter was required to withdraw from her elective courses for the next semester so she could focus on her core classes. Dr. Matz again encouraged Slaughter to use the student counseling center and CASE, attend all classes, and enter the Extended Pathways to Success Program.

On January 7, 2015, Slaughter met with Dr. Craig Canby, the Associate Dean for Academic Curriculum and Medical Programs, to discuss DMU's policies with regard to academic probation and academic dismissal and to develop an action plan for the upcoming semester. The

action plan consisted of study strategies designed to help Slaughter learn course material. Dr. Canby was unaware of Slaughter's depression. Dr. Canby later stated that had he known, "[i]t would have changed the nature of [the] conversation," and he likely would have advised her to seek an accommodation or to take a medical leave of absence.

Also in early January, Oren contacted Slaughter to see whether she would like to talk more about the Extended Pathways Program. Slaughter responded that she was "doing fine" and was "still planning on sticking with the 4 year plan." Oren met with Slaughter one-on-one several times during the second semester to discuss her progress, including meetings on January 7 and 30 and April 10. Oren told Slaughter that she could contact her at any time with questions.

Slaughter continued to struggle academically throughout the second semester, although she ultimately passed the biochemistry course that she had failed first semester. Slaughter met with Dr. Matz in February to discuss her poor performance in her required physiology course. Dr. Matz explained the consequences of failing two courses in the first year, including possible dismissal from DMU.

Slaughter failed physiology and performed poorly in other second semester courses. She ended the second semester with a GPA of 1.88, lower than her first semester GPA of 2.53. Under DMU policy, Slaughter was required to appear before the APC for a dismissal hearing for failing two of her required first-year courses. Slaughter attended the dismissal hearing with the APC on June 30. At Slaughter's request, Dr. Sanders appeared as her advisor. Slaughter discussed her academic performance as well as her use of the DMU resources. She expressed her preference to retake physiology over the summer instead of entering the Extended Pathways Program. Slaughter told the APC that she believed most of her

struggles were due to her depression. Regardless, she argued there was an upward trend with her individual physiology test grades.

On July 7, Slaughter was notified that the APC had voted to dismiss her from DMU due to her failing two required first-year courses and her lack of academic professional promise. Slaughter appealed the APC decision. On appeal, DMU concluded the APC complied with DMU's policies and due process and affirmed Slaughter's dismissal.

Slaughter filed a complaint with the Iowa Civil Rights Commission, alleging disability discrimination in violation of the Iowa Civil Rights Act (ICRA). After obtaining a right-to-sue letter, she filed this three-count lawsuit under the ICRA against DMU, alleging discrimination, failure to accommodate, and retaliation based on her mental disability.

After conducting discovery, DMU moved for summary judgment on all counts. DMU's motion stated, "The undisputed material facts demonstrate that DMU reasonably accommodated Slaughter throughout her enrollment at DMU. Accordingly, Slaughter cannot prove her failure to accommodate claim." DMU noted in its statement of undisputed facts,

> The sole accommodations that Slaughter claims she proposed to DMU, but did not receive, are 1) the ability to watch classes online, in lieu of attending them in person, and 2) the ability to take electives while on academic probation.

DMU supported its motion with sworn testimony (deposition excerpts and affidavits). Slaughter resisted and filed a cross-motion for partial summary judgment on her accommodation claim. She denied that the accommodations DMU identified were the sole accommodations she sought, but she did not identify what other accommodations she requested. In DMU's reply to Slaughter's resistance, it noted, "Slaughter has pointed to no evidence that she requested a reasonable

accommodation that would have enabled her to meet the essential eligibility requirement of passing her required first-year courses." DMU continued,

> Slaughter has pointed to no evidence that she could have been reasonably accommodated, but for DMU's alleged lack of good faith . . . . Instead, Slaughter states that "we will never know" whether she could have performed with reasonable accommodations. Such speculation is not sufficient to survive summary judgment.

Slaughter also filed a "motion to determine admissibility [of evidence,]" which sought a ruling that imputed Dr. Sanders's knowledge of Slaughter's depression to DMU. Slaughter argued that because Dr. Sanders is employed by DMU, her knowledge of Slaughter's depression should be imputed to the University as of September 2014 when their counseling sessions began—about three months before Slaughter first disclosed her depression to the academic decision-makers. DMU resisted.

The district court determined that the psychotherapist–patient privilege applied to the communications between Slaughter and Dr. Sanders and that Slaughter had not waived the privilege. The district court concluded, "To the extent Dr. Sanders has knowledge of [Slaughter's] mental health condition pursuant to her role as a treatment provider, that knowledge cannot be imputed to DMU in its role as an academic institution." The district court also noted provisions in Iowa Code chapter 228 (2014) mandated confidentiality of mental health information. For those reasons, the district court denied Slaughter's evidentiary motion.

At the hearing on the motions, Slaughter abandoned her discrimination claim (count I) and retaliation claim (count III). The district court granted summary judgment in favor of DMU dismissing

those claims, and Slaughter does not appeal those rulings. With regard to Slaughter's failure-to-accommodate claim (count II), the district court concluded that DMU became aware of Slaughter's mental disability on December 17, 2014, when she informed Oren and Dr. Matz of her depression. The district court rejected Slaughter's claim that DMU failed to engage in good faith in an interactive process to accommodate her depression.

> From the fall of 2014 until the time she was dismissed in the spring of 2015, DMU officials consistently communicated with plaintiff and sought methods to help her improve her academic performance. There was no breakdown in communications. Even viewed in the light most favorable to plaintiff, a reasonable fact finder could not find that DMU failed to act in good faith when engaging in an interactive process to accommodate plaintiff and assist her in satisfying DMU's academic standards despite her depression.

The court also rejected Slaughter's argument that a reasonable accommodation "would have been discovered but for DMU's bad faith." The district court noted Slaughter "offers no evidence that DMU denied any reasonable accommodation she suggested" and that she explicitly conceded "there is no way of knowing whether she could have been successful in meeting DMU's academic standards had she been accommodated differently." The district court entered summary judgment dismissing count II, stating,

> On this record, plaintiff has not suggested any accommodations which would have enabled her to pass her classes. Even viewed in the light most favorable to plaintiff, no reasonable factfinder could find that but for DMU's bad faith, plaintiff could have satisfied DMU's academic standards with a reasonable accommodation.

Slaughter appealed, and we retained her appeal.

## II. Standard of Review.

We review rulings on the admissibility of allegedly privileged communications for abuse of discretion. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2001). We review rulings interpreting a statutory privilege for correction of errors at law. *Id.*; *Fagen v. Grand View Univ.*, 861 N.W.2d 825, 829 (Iowa 2015).

"We review summary judgment rulings for correction of errors at law." *Deeds v. City of Marion*, 914 N.W.2d 330, 339 (Iowa 2018). "Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law." *Id.* (quoting *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014)). "We view the record in the light most favorable to the nonmoving party." *Id.*

## III. Analysis.

We first address whether the district court erred in denying Slaughter's motion for an evidentiary ruling imputing her psychotherapist's knowledge of her mental disability to DMU's academic decision-makers. We conclude the district court correctly applied the statutory confidentiality requirements for mental health treatment in Iowa Code chapter 228 to deny Slaughter's motion. We next address whether the district court erred in granting DMU's motion for summary judgment on Slaughter's failure-to-accommodate claim. We conclude the district court correctly granted summary judgment for DMU based on the undisputed facts. Slaughter is unable to identify any reasonable accommodation she requested that DMU refused. She cannot show that a reasonable accommodation existed that would have allowed her to meet DMU's academic standards.

**A. Slaughter's Motion to Impute Her Psychotherapist's Confidential Knowledge to DMU.** It is undisputed that Dr. Sanders was employed by DMU as a staff psychologist in DMU's student counseling center when she treated Slaughter for depression beginning in September 2014. Slaughter argues that Dr. Sanders's knowledge of her depression learned while treating her must be imputed to DMU under principles of agency law.[1] *See John Q. Hammons Hotels, Inc. v. Acorn Window Sys., Inc.*, 394 F.3d 607, 611 (8th Cir. 2005) ("It has long been held in Iowa that where information is imparted to an employee, acting within the scope of his employment, the knowledge of the employee is imputed to the employer under principles of agency law."). The district court rejected that argument, ruling that this general principle of agency law yields to the psychotherapist–patient privilege and statutory confidentiality for mental health treatment notwithstanding Dr. Sanders's status as an employee of DMU. This is a question of first impression in Iowa.[2]

We begin by addressing the scope of the statutory restrictions on sharing mental health treatment information. We then address whether the statutory nondisclosure requirements trump the general principle of agency law imputing an employee's knowledge to the employer.

---

[1]Slaughter also argues that the knowledge of Oren, her faculty adviser, should be imputed on DMU. However, the record does not show that Slaughter discussed her depression with Oren at any time before the APC meeting on December 16, 2014. Slaughter told Oren about her depression the following day, immediately before Slaughter emailed Dr. Matz disclosing her depression for the first time. Because Oren only knew of Slaughter's disability minutes before Slaughter disclosed it to Dr. Matz, we see no basis for reversal.

[2]In *Deeds*, we declined to impute a physician's knowledge of a job applicant's disability to the prospective employer, City of Marion, because the record showed the physician (hired by the city to perform preemployment physicals) was an independent contractor, not the city's employee or agent. 914 N.W.2d at 349.

1. *Statutory prohibitions on disclosure of mental health information.* The district court relied on two Iowa statutes protecting the privacy of mental health information: Iowa Code sections 622.10 and 228.2. We will address each in turn. Section 622.10 codifies the psychotherapist–patient privilege for evidentiary purposes and provides,

> A . . . mental health professional, . . . who obtains information by reason of the person's employment . . . shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.

Iowa Code § 622.10(1). The term "mental health professional" includes psychologists licensed under Iowa Code chapter 154B. *Id.* § 622.10(7). The parties agree that Dr. Sanders is a mental health professional within the meaning of section 622.10. "The privilege [of Iowa Code 622.10] extends to medical records that contain information which would be inadmissible at trial as oral testimony from the physician." *State v. Eldrenkamp*, 541 N.W.2d 877, 881 (Iowa 1995). The testimonial privilege in section 622.10 also limits discovery into physician–patient communications. *Chung v. Legacy Corp.*, 548 N.W.2d 147, 151 (Iowa 1996).

The purpose of the psychotherapist–patient "privilege is 'to promote free and full communication between a patient and his doctor so that the doctor will have the information necessary to competently diagnose and treat the patient.'" *Fagen*, 861 N.W.2d at 831–32 (quoting *State v. Heemstra*, 721 N.W.2d 549, 560–61 (Iowa 2006)). We construe section 622.10 liberally to carry out this purpose. *Id.* "We have repeatedly emphasized 'the importance of maintaining confidentiality in mental health treatment.'" *In re A.M.*, 856 N.W.2d 365, 377 (Iowa 2014)

(quoting *State v. Thompson*, 836 N.W.2d 470, 483 (Iowa 2013)). Indeed, "[t]he American Psychiatric Association has recognized that confidentiality is essential to effective treatment." *Id.* "[A] right as valuable as a psychotherapist privilege should not be deemed to be waived by implication except under the clearest of circumstances." *Heemstra*, 721 N.W.2d at 560.

The district court ruled that section 622.10 applies to preclude imputing Dr. Sanders's knowledge gained treating Slaughter to DMU. We reach a different conclusion. "The physician–patient rule provided in section 622.10 is an evidentiary rule rather than a substantive right." *Roosevelt Hotel Ltd. P'ship v. Sweeney*, 394 N.W.2d 353, 355 (Iowa 1986). We have not applied section 622.10 outside of litigation to mandate confidentiality of physician–patient communications. *See id.* (noting "the medical profession's self-imposed standard of conduct, originating in the Hippocratic oath, that a physician not disclose a patient's confidences without the patient's consent, except as authorized or required by law"). Accordingly, we do not rely on section 622.10 here.

The district court, however, properly relied on Iowa Code section 228.2, which more broadly restricts disclosure of mental health information.

> Except as specifically authorized in [sections not relevant here], a mental health professional, data collector, or employee or agent of a mental health professional, of a data collector, or of or for a mental health facility shall not disclose or permit the disclosure of mental health information.

Iowa Code § 228.2(1). Chapter 228 permits certain limited disclosures. For example, a patient eighteen years or older may consent to the disclosure of mental health information. *Id.* § 228.3(1). Slaughter,

however, did not give Dr. Sanders consent to divulge Slaughter's depression to DMU's academic decision-makers.

Slaughter instead relies on another exception stating, "Mental health information relating to an individual may be disclosed to other providers of professional services or their employees or agents if and to the extent necessary to facilitate the provision of administrative and professional services to the individual." *Id.* § 228.5(4). Slaughter argues that section 228.5(4) required Dr. Sanders to disclose Slaughter's name and diagnosis to DMU's accommodation specialists so they could provide Slaughter with services.

The district court correctly found this disclosure provision to be inapplicable. "Professional services" are defined to "mean[] diagnostic or treatment services for a mental or emotional condition provided by a mental health professional." *Id.* § 228.1(8). DMU's academic accommodation specialists are not mental health professionals who would diagnose or treat Slaughter's anxiety and depression. "Administrative information" relates to billing information but does not include the patient's diagnosis. *Id.* § 228.1(1). Section 228.5(4) would not allow Dr. Sanders to disclose Slaughter's depression to DMU's academic decision-makers. In addition, the Federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) mandates confidentiality of mental health treatment. *See generally* Pub. L. No. 104–191, 110 Stat. 1936 (codified in scattered sections of 18, 26, 29, and 42 U.S.C.); *Harrold-Jones v. Drury*, 422 P.3d 568, 570–77 (Alaska 2018) (noting "cultural shift emphasizing medical privacy" and reviewing HIPPA requirements and interplay with state law); *In re A.M.*, 856 N.W.2d at 379–80 (reviewing HIPAA privacy regulations); 45 C.F.R. pts. 160, 164 (2014) (HIPAA privacy regulations).

The district court correctly concluded that Dr. Sanders was prohibited from divulging Slaughter's mental health information to DMU without a waiver from Slaughter, which she had not provided. Indeed, other courts have recognized a psychotherapist's tort liability for unauthorized disclosure of a patient's confidential information. *See, e.g., Gracey v. Eaker*, 837 So. 2d 348, 353, 357 (Fla. 2002). The statutory protections against disclosure of mental health information do not depend on who pays the therapist's salary. The same confidentiality applies whether the therapist is in private practice or a university employee. A contrary holding would have a chilling effect on the willingness of students to open up to psychotherapists employed by their university.

2. *Exceptions to agency law principles generally imputing an employee's knowledge to the employer.* Slaughter nevertheless argues that under principles of agency law, Dr. Sanders's knowledge of Slaughter's disability should be imputed to DMU's academic decision-makers for purposes of determining whether DMU failed to reasonably accommodate her. "Iowa subscribes to the well-settled rule that 'ordinarily knowledge of an agent is imputed to the principal.'" *John Q. Hammons Hotels, Inc.*, 394 F.3d at 611 (quoting *Mechanicsville Tr. & Sav. Bank v. Hawkeye-Sec. Ins.*, 158 N.W.2d 89, 91 (Iowa 1968)). But here, this general rule must yield to an exception for privileged communications.

The Restatement (Third) of Agency provides,

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent
>
> . . . .

(b) is subject to a duty to another not to disclose the fact to the principal.

Restatement (Third) of Agency § 5.03(b), at 359 (Am. Law Inst. 2006) [hereinafter Restatement (Third)].

Because Dr. Sanders owes a statutory duty to Slaughter not to disclose the information she learns during her counseling sessions, Dr. Sanders's knowledge of Slaughter's disability cannot be imputed to the academic decision-makers at DMU. *See Reinninger v. Prestige Fabricators, Inc.*, 523 S.E.2d 720, 725 (N.C. Ct. App. 1999) (holding that a company physician's knowledge gained from confidential communications with employee–patient could not be imputed to the employer to show that there was improper ex parte communication between the employer and physician); Restatement (Third) § 5.03(b) cmt. *e*, at 374–75; *see also Farnsworth v. Hazelett*, 197 Iowa 1367, 1373, 199 N.W. 410, 413 (1924) ("When [the knowledge] has been acquired confidentially as attorney for a former client in a prior transaction, the reason of the rule ceases, and in such a case an agent would not be expected to do that which would involve the betrayal of professional confidence; and his principal ought not to be bound by his agent's secret and confidential information." (alteration in original) (quoting *Akers v. Rowan*, 12 S.E. 165, 172 (S.C. 1890))).

We hold the disclosure restrictions in Iowa Code chapter 228 and HIPAA fall within this exception to the general principle of agency law imputing an employee's knowledge to the employer. The district court correctly ruled that confidential information Dr. Sanders learned while treating Slaughter is not imputed to DMU. We affirm the ruling denying Slaughter's evidentiary motion.

**B. Slaughter's Failure-to-Accommodate Claim.** The district court granted DMU's motion for summary judgment dismissing Slaughter's claim the medical school failed to accommodate her mental disability. Slaughter argues questions of fact precluded summary judgment. DMU argues summary judgment was correctly granted based on the undisputed facts. We begin by reviewing the governing law. We then determine whether the district court correctly applied the law to this factual record.

1. *Failure-to-accommodate claims in higher education.* Slaughter brought her action under the ICRA. The ICRA "shall be construed broadly to effectuate its purposes." Iowa Code § 216.18(1). "It is an unfair or discriminatory practice for any educational institution to discriminate on the basis of . . . disability in any program or activity." *Id.* § 216.9(1). In *Palmer College of Chiropractic v. Davenport Civil Rights Commission*, we reviewed disability claims against a chiropractic school. 850 N.W.2d 326, 328–29 (Iowa 2014). We looked to cases interpreting the Americans with Disabilities Act (ADA) and the Rehabilitation Act as well as employment discrimination cases for guidance analyzing disability discrimination claims brought under the ICRA against a graduate school. *Id.* at 333–34. We acknowledged courts owe "some deference to the institution's professional or academic judgment" in determining its obligation to reasonably accommodate a student's disability. *Id.* at 337. But we concluded the educational institution

> has a "real obligation" to seek out "suitable means of reasonably accommodating" individuals with disabilities and to submit "a factual record indicating" it "conscientiously carried out this statutory obligation." That obligation requires an individualized and extensive inquiry—an institution must "carefully consider[] each disabled student's particular limitations and analyz[e] whether and how it might accommodate that student in a way that would allow

the student to complete the school's program without lowering academic standards."

*Id.* (alterations in original) (citation omitted) (first quoting *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25–26 (1st Cir. 1991); then quoting *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 826 (9th Cir. 1999)).

Judicial deference to the institution is especially appropriate for purely academic requirements. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513 (1985) ("When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." (Footnote omitted.)); *see also Palmer*, 850 N.W.2d at 339 (applying *Ewing* to evaluate requested accommodation to technical standards in chiropractic program).

The student asserting a failure-to-accommodate claim must show that (1) she is disabled, (2) the defendant had notice of her disability, (3) she is an "otherwise qualified" student either with or without a reasonable accommodation, and (4) the defendant failed to provide reasonable accommodations. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076–77 (8th Cir. 2006); *see also Palmer*, 850 N.W.2d at 334. "A . . . disabled person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998).[3]

---

[3] *See also Palmer*, 850 N.W.2d at 334 (defining "qualified individual" under the Rehabilitation Act as someone "who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity," 34 C.F.R. § 104.3(*l*)(3) (2013), and defining a "qualified individual with a disability"

The student "bears the initial burden of demonstrating that he requested reasonable accommodations . . . and that those accommodations would render him otherwise qualified" to meet the educational institution's essential eligibility requirements. *Mershon*, 442 F.3d at 1077. As we have said in the employment context, "the plaintiff must produce enough evidence to make a facial showing that reasonable accommodation is possible." *Boelman v. Manson State Bank*, 522 N.W.2d 73, 80 (Iowa 1994). "This showing is not an onerous one and requires no more of the employee than to propose an accommodation and present testimony of its feasibility." *Goodpaster*, 849 N.W.2d at 17; *see also Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 83 (1st Cir. 2019) (affirming summary judgment for employer and stating the employee's request for accommodation for her depression and PTSD "must comprise more than a cryptic communication to be deciphered by the recipient" and "[i]mportantly, such a request must illuminate the linkage between the requestor's disability and the requested accommodation").

An accommodation is unreasonable "if it requires 'a fundamental alteration'" to the academic program. *Palmer*, 850 N.W.2d at 336 (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410–12, 99 S. Ct. 2361, 2369–70 (1979)). "It is beyond question that it would fundamentally alter the nature of a graduate program to require the admission of a disabled student who cannot, with reasonable accommodations, otherwise meet the academic standards of the program." *Mershon*, 442 F.3d at 1076.

---

under the ADA as someone "who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided," 42 U.S.C. § 12131(2) (2006)).

The student's request for accommodations triggers the interactive process. *Id.* at 1077; *see also Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1046–47 (9th Cir. 1999). In the employment context,

> [t]o show that an employer failed to participate in the interactive process, an employee must show that: (1) the employer knew of the employee's disability; (2) the employee requested accommodations or assistance; (3) the employer did not in good faith assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012). The parties agree we should use this standard in the educational context when evaluating failure-to-accommodate claims under the ICRA.

2. *DMU's actions in attempting to accommodate Slaughter.* DMU agrees that Slaughter is disabled within the meaning of the ICRA, that DMU had notice of her mental disability, and that the interactive process was triggered by Slaughter's email of December 17, 2014. The parties agree that without an accommodation, Slaughter was not a qualified individual for DMU's medical degree program. It is undisputed that she failed two required courses and performed poorly in other courses her first year. Her second semester GPA declined to 1.88 from a first semester GPA of 2.53, lowering her cumulative GPA to 2.19. Her poor performance provided grounds for her expulsion under DMU's academic standards. She does not appeal the district court's summary judgment dismissing her disability discrimination and retaliation claims. The sole issue is whether the district court erred by granting summary judgment on her failure-to-accommodate claim.

The district court relied on undisputed facts. DMU offered Slaughter the Extended Pathways to Success Program, extending the medical school program a fifth year, which she refused. DMU provided

her weekly psychotherapy at no cost and one-on-one tutoring throughout her first year, as well as regular consultations with her faculty advisor and Dr. Matz, the chair of the APC. She still failed to meet the academic requirements. At Slaughter's request, DMU permitted her to monitor lectures online instead of sitting in the classroom. She asked for permission to continue taking elective courses while on academic probation, which DMU refused. DMU's policy is to defer elective courses to enable the student struggling on academic probation to concentrate on required courses. We defer to DMU's academic judgment. *See Ewing*, 474 U.S. at 225, 106 S. Ct. at 513; *see also Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 355 (6th Cir. 2015) (holding as a matter of law that a medical student's request for a decelerated five-year rather than a four-year curriculum was not a reasonable accommodation). Slaughter never explained how *increasing* her workload with electives would have helped her pass the core courses. She never asked for an academic withdrawal or medical leave. She never asked for additional time during examinations. She never asked for additional tutoring, academic counseling, or psychotherapy beyond that already provided to her. She never asked for any additional physical assistance. She was denied no request for equipment or technical support.

DMU interacted extensively with Slaughter to help her meet its academic standards before and after she disclosed her depression. We decline to disregard DMU's efforts to accommodate Slaughter's academic struggles that preceded her disclosure. She attributes her academic struggles to her depression, and the extra assistance DMU provided her was to assist her academic performance. The district court correctly concluded,

Arguably, DMU's actions were not specifically directed at accommodating plaintiff's claimed disability of depression. However, DMU consistently worked with plaintiff and offered options and resources to help her succeed as a student, and it is immaterial whether those actions are characterized as efforts to accommodate her disability or efforts to improve her academic performance. The fact that DMU offered the same types of services and resources to other students who do not have disabilities cannot be held against the university. What counts is whether DMU engaged in a process with plaintiff that would allow the parties to discover reasonable accommodations that would allow plaintiff to succeed with her coursework.

(Citation omitted.) Similarly, in *Halpern v. Wake Forest University Health Sciences*, the United States Court of Appeals for the Fourth Circuit weighed a medical school's efforts to assist a struggling student *before and after* he disclosed his anxiety disorder and attention deficit/hyperactivity disorder (ADHD). 669 F.3d 454, 466 (4th Cir. 2012). The Fourth Circuit affirmed summary judgment, dismissing a failure-to-accommodate mental disability claim based on the school's "significant efforts throughout the period of Halpern's enrollment to help him satisfy its academic and professional standards." *Id.* That court saw no reason to disregard assistance provided before the plaintiff disclosed his mental diagnosis, nor do we. In any event, the psychotherapy provided by Dr. Sanders throughout the year was specifically treating Slaughter's depression.

We agree with the district court that Slaughter has failed to identify any reasonable accommodation she requested that DMU refused. She named no such requested accommodation in resisting summary judgment, in her appellate briefs, or in her counsel's oral argument in this appeal.

This case is unlike *Dean v. University at Buffalo School of Medicine & Biomedical Sciences*, in which the medical student suffering from

depression actually "requested a three-month leave to seek medical treatment and study" for a required examination. 804 F.3d 178, 190–91 (2d Cir. 2015). The school denied his request. *Id.* at 191. The district court granted summary judgment dismissing his ADA failure-to-accommodate claim. *Id.* at 182. The appellate court reversed, concluding the student met his initial burden resisting summary judgment by showing the existence of an accommodation he requested that would allow him to meet the essential requirements of the program and that a jury could find the abbreviated study time offered by the school would be ineffective. *Id.* at 190–91. The *Dean* court noted the plaintiff "offered evidence to establish that he was not treated in an evenhanded manner with respect to similarly situated students." *Id.* at 189.

By contrast, Slaughter never asked DMU for medical leave and offered no evidence that similarly situated students were treated more favorably. Apart from what she requested while a student at DMU, Slaughter subsequently failed to identify any possible accommodation she claims could have enabled her to meet DMU's academic standards. Slaughter and her counsel, prior to summary judgment, were well aware of Dr. Canby's testimony that *he* would have considered offering her a medical leave. Nevertheless, Slaughter from the inception of this lawsuit through oral argument and resolution of this appeal never mentioned medical leave as a possible accommodation she would have accepted. She made no claim for medical leave in her district court resistance to summary judgment or at any point in this appeal. It is not the court's role to propose medical leave on her behalf.[4]

---

[4]It may well be that Slaughter did not want medical leave for the same reasons she expressly declined the offer to enter into the Extended Pathways to Success

We decline to speculate that continued interaction would have revealed a reasonable accommodation that Slaughter and her counsel had yet to discover. *See Hlubek v. Pelecky*, 701 N.W.2d 93, 96 (Iowa 2005) ("Speculation is not sufficient to generate a genuine issue of fact."). We are applying the plain meaning of our rule of civil procedure governing summary judgment, which provides,

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered.

Iowa R. Civ. P. 1.981(5). As we have long emphasized,

> The resistance must set forth specific facts which constitute competent evidence showing a *prima facie* claim. By requiring the resister to go beyond generalities, the basic purpose of summary judgment procedure is achieved: to weed out "[p]aper cases and defenses" in order "to make way for litigation which does have something to it."

*Thompson v. City of Des Moines*, 564 N.W.2d 839, 841 (Iowa 1997) (alteration in original) (quoting *Fogel v. Trs. of Iowa Coll.*, 446 N.W.2d 451, 454 (Iowa 1989)).

> Summary judgment is not a dress rehearsal or practice run; "it is the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events."

---

Program. In any event, "[w]hile allowing a medical leave of absence might, in some circumstances, be a reasonable accommodation, '[a]n employer is not required by the ADA . . . to provide an unlimited absentee policy.'" *Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008) (citation omitted) (quoting *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999); *see also id.* (affirming summary judgment for employer on grounds that employee "failed to demonstrate that her requested accommodation of additional time off to recuperate would have enabled her to have consistent attendance at work").

*Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005) (quoting *Schacht v. Wis. Dep't of Corr.,* 175 F.3d 497, 504 (7th Cir. 1999), *overruled on other grounds as stated in Higgins v. Mississippi,* 217 F.3d 951, 954 (7th Cir. 2000); *see also Drainage Dist. No. 119 v. Incorporated City of Spencer,* 268 N.W.2d 493, 499 (Iowa 1978) ("The purpose of summary judgment is to enable a judgment to be obtained promptly and without the expense of a trial when there is no genuine and material fact issue present."); *Bauer v. Stern Fin. Co.,* 169 N.W.2d 850, 853 (Iowa 1969) ("The purpose of all summary judgment rules is to avoid useless trials. . . . [A] party may not 'rest upon the mere allegations or denials of his pleading.' He must set forth specific facts showing there is a genuine issue. He cannot merely say there is one; but it must appear 'by affidavits or otherwise' that this is the case."); *James v. Swiss Valley Ag Serv.,* 449 N.W.2d 886, 888 (Iowa Ct. App. 1989) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986))).

We need not decide whether DMU should have done more to engage in the interactive process with Slaughter.[5] To avoid summary

---

[5]This case is factually distinguishable from *Taylor v. Phoenixville School District,* 184 F.3d 296 (3d Cir. 1999). The plaintiff in *Taylor,* a secretary to an elementary school principal, had performed her job with exemplary reviews for almost twenty years until she began experiencing the onset of a manic episode while at work. *Id.* at 302. The plaintiff took a leave of absence and was admitted to a psychiatric hospital where she was diagnosed with bipolar disorder. *Id.* at 302–03. After approximately three weeks of hospitalization, the plaintiff was discharged with orders to continue taking medication and meeting with a psychiatrist. *Id.* at 303. The plaintiff returned to work and sought accommodations from her employer. *Id.* Instead of offering accommodations, her employer increased the difficulty of her job and began documenting her mistakes. *Id.* at 303–05. The plaintiff was eventually terminated from her position. *Id.* at 305.

judgment, Slaughter had to make a facial showing that a reasonable accommodation existed that could have enabled her to meet the medical school's academic requirements. She made no such showing. Other courts have affirmed summary judgment dismissing failure-to-accommodate claims when the plaintiff lacked evidence that a reasonable accommodation existed, even if the defendant had failed to engage in an adequate interactive process. *See, e.g.*, *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 293 (7th Cir. 2015) ("But regardless of the state of the record, an employer's failure 'to engage in the required [interactive] process . . . need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation.' " (alterations in original) (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013))); *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (concluding that if an employee cannot generate a fact question as to whether a reasonable accommodation, the employer will not be liable "[e]ven if [the employer] did not put sufficient effort into the 'interactive process' of finding an accommodation"); *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015) ("However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to

_____

The *Taylor* court determined that "[a] reasonable jury could conclude that the school district did not engage in an interactive process of seeking accommodations and is responsible for the breakdown in the [interactive] process." *Id.* at 315. The court concluded, "Given the evidence [the plaintiff] presents of *bad faith* on the school district's part, we will not decide on summary judgment that it would have been fruitless for the school district to make some modest and fairly obvious efforts to accommodate." *Id.* at 319 (emphasis added); *see also id.* (discussing possible reasonable accommodations). The Third Circuit noted, however, that if the jury determined the employer had not caused the breakdown in the interactive process, the plaintiff still "must demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job." *Id.* at 320.

demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position."); *Jones v. Nationwide Life Ins.*, 696 F.3d 78, 91 (1st Cir. 2012) (noting "[a]n employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions of [his] job with an accommodation[,]" and "[i]t was [the employee's] burden 'to proffer accommodations that were reasonable under the circumstances'" (quoting *Jones v. Walgreen Co.*, 679 F.3d 9, 19 & n.6 (1st Cir. 2012))); *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1265 (10th Cir. 2009) ("Even if [an employer] fail[s] to fulfill its interactive obligations to help secure a [reasonable accommodation], [the plaintiff] will not be entitled to recovery unless [s]he can also show that a reasonable accommodation was possible. . . ." (alterations in original) (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc))); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 101 (2d Cir. 2009) ("The employer's failure to engage in such an interactive process, however, does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible.").[6] *But see Snapp v. United Transp. Union*, 889 F.3d 1088, 1100 (9th Cir. 2018) (taking minority view by holding at summary judgment stage employer has the burden to show no reasonable accommodation existed), *cert. denied*, 139 S. Ct. 817 (2019).

In *Stern v. University of Osteopathic Medicine & Health Sciences*, the Eighth Circuit affirmed summary judgment dismissing a medical student's failure-to-accommodate claims under the ICRA and federal law.

---

[6]The court in *Snapp v. United Transportation Union* set fort the foregoing authorities in its opinion.  889 F.3d 1088, 1099–1100 (9th Cir. 2018 (Meloy, J.), *cert. denied*, 139 S. Ct. 817 (2019).

220 F.3d 906, 908–09 (8th Cir. 2000). The student notified the medical school that he had dyslexia and requested accommodations on multiple-choice exams to allow him to explain answers by essay or through oral questioning. *Id.* at 907. The medical school offered different accommodations—someone reading the questions to the student on audiotape, a private room, and additional time for the exams; the student nevertheless failed too many exams to stay enrolled. *Id.* The district court granted summary judgment on grounds the school reasonably accommodated him as a matter of law. *Id.* at 907–08. The student appealed, arguing "the medical school had failed to engage in an interactive process with him to determine what accommodations for his disability were reasonable." *Id.* at 908. The Eighth Circuit affirmed the summary judgment because "Stern did not provide probative evidence [of a reasonable accommodation] that would permit a fact finder to rule in his favor without engaging in speculation." *Id.* at 909.

Similarly, in *Mershon,* the Eighth Circuit affirmed summary judgment dismissing ADA failure-to-accommodate claims, notwithstanding a disabled student's evidence the University failed to engage in the interactive process, because the sight-impaired, wheelchair-bound student failed to meet his "initial burden of demonstrating that reasonable accommodations would render him qualified for admission into the graduate school." 442 F.3d at 1078 (noting deference due graduate school's academic judgment). Slaughter's claim fails for the same reason. DMU was entitled to summary judgment on this record based on Slaughter's failure to make a facial showing of any reasonable accommodation that could have enabled her to meet DMU's academic requirements. *See id.*

This case stands in sharp contrast to *Palmer*. In *Palmer*, a blind student requested accommodations to meet technical requirements in a graduate program at a chiropractic school. 850 N.W.2d at 329–30. Palmer's technical requirements included the ability to interpret and make diagnoses based on radiographic images (x-ray films). *Id.* at 330, 345. The student asked that a "sighted assistant" describe what the images depicted so that the student could then make interpretive diagnoses. *Id.* at 330. Palmer refused, on grounds that the requested accommodation "would fundamentally alter the institution's educational program." *Id.* The student filed a complaint with the Davenport Civil Rights Commission. *Id.* at 331. The commission conducted a two-day evidentiary hearing and issued a final order with extensive findings of fact and conclusions of law that Palmer violated the ICRA and ADA by refusing the requested accommodation. *Id.* at 332. The commission relied on evidence that Palmer previously graduated blind students from its chiropractic program, that Palmer's California campus had already waived similar vision-specific competency requirements without compromising its accreditation, that many practicing chiropractors outsource the interpretation of radiographic images, and that Palmer failed to present evidence state licensing boards would exclude blind chiropractors. *Id.* On judicial review, our court affirmed the commission based on those factual findings. *Id.* at 344–46.

In *Palmer*, the school violated the ICRA by denying the student's requested accommodation of a sighted assistant to enable him to satisfy course requirements. *Id.* at 330, 345. By contrast, Slaughter cannot identify *any* accommodation that she requested and DMU refused that could have enabled her to meet her school's academic requirements. In *Palmer*, we relied on evidence that other blind students were allowed to

graduate. *Id.* at 331. Slaughter, however, does not claim any other medical students with depression were granted accommodations DMU denied to her.

Medical schools must prepare their students for a demanding profession. *See Ohio Civil Rights Comm'n v. Case W. Reserve Univ.*, 666 N.E.2d 1376, 1387 (Ohio 1996) ("[G]raduates must have the knowledge and skills to function in a broad variety of clinical situations and to render a wide spectrum of patient care."). Graduate schools are not required to lower their academic standards to accommodate a student's disability. *Palmer*, 850 N.W.2d at 337. Appellate courts reviewing records comparable to Slaughter's have given due deference to the faculty's academic judgment when affirming summary judgments dismissing a medical student's failure-to-accommodate disability claim. *See Halpern*, 669 F.3d. at 463 (collecting cases extending "deference to schools' professional judgments regarding students' qualifications when addressing disability discrimination claims" and according "great respect" to medical school's academic judgment expelling student with ADHD and anxiety); *Zukle*, 166 F.3d at 1047–48, 1050–51 (noting "a majority of circuits have extended judicial deference to an educational institution's academic decisions" and concluding medical school was not required to keep student with learning disability on a decelerated schedule); *Kaltenberger*, 162 F.3d at 436 ("Right or wrong, we must defer to this considered academic judgment" expelling student with ADHD who remained unable to pass biochemistry after a variety of accommodations); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795–96 (1st Cir. 1992) (reviewing undisputed facts "in the deferential light that academic decisionmaking deserves" and determining that no "reasonable factfinder could conclude that Tufts, having volunteered

such an array of remedial measures, was guilty of failing to make a reasonable accommodation [for dyslexia] merely because it did not *also* offer Wynne, unsolicited, an oral rendering of the biochemistry examination"). We accord the same respect to DMU's academic judgment expelling a medical student who failed required courses despite the ongoing academic assistance and psychotherapy provided to her.

As the Ohio Supreme Court concluded, "considerable judicial deference must be paid to academic decisions made by the institution itself unless it is shown that the standards serve no purpose other than to deny an education to the handicapped." *Case W. Reserve Univ.*, 666 N.E.2d at 1386. Slaughter made no such showing.

**IV. Disposition.**

For these reasons, we affirm the district court's denial of Slaughter's motion for evidentiary ruling and affirm the summary judgment in favor of DMU.

**AFFIRMED.**

All justices concur except Appel, J., Cady, C.J., and Wiggins, J., who dissent.

#17–1732, *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*

**APPEL, Justice (dissenting).**

This case is depressing.

As a society, we are often uncomfortable with the subject of depression. Victims of depression are often either in deep denial or at least embarrassed because of perceptions, frequently accurate, about potential stigmatization. Even loved ones are inclined to ignore it in favor of explanations that are less stigmatizing. Rather than confront depression in a direct and forthright manner, employers, peers, and even loved ones are frequently inclined to ignore the illness even when it impacts the victim's behavior. Third parties favor explanations that allow them to stay within their comfort zone and which may be morally satisfying. Even with persons who know better, the preferred approach is to look away under the understandable but flawed notion that "the less said, the better."

Fortunately, professionals in the healing arts have been at the forefront of the effort to alter society's impression that persons suffering depression are faking it or are somehow morally responsible for their condition. Medical professionals acknowledge, and the literature firmly establishes, that depression can dramatically alter the ability of the sufferer to perform and engage in tasks both complex and simple. Absolutely brilliant people can be immobilized. Geniuses from Lincoln to Darwin appear to have suffered, periodically at least, from debilitating depression.

Depression is not the exclusive domain of lawyers, dentists, and geniuses. Depression and depressive symptoms are disturbingly common among medical students. A recent study published in the Journal of the American Medical Society (JAMA) concluded, after

canvasing almost 200 peer-reviewed studies, that the level of depression or depressive symptoms among medical students is 27.2%.   Lisa S. Rotenstein et al., *Prevalence of Depression, Depressive Symptoms, and Suicidal Ideation Among Medical Students: A Systematic Review and Meta-Analysis,* 316 J. Am. Med. Ass'n 2214, 2214 (2016).   The study noted that depression among medical students is two to five times greater than similarly aged people in the general population.  *Id.* at 2229.

The JAMA article did not emerge from the academic ether.  In the past twenty years, a significant body of medical literature has emerged dealing with various aspects of depression and mental health issues among medical students.   *See, e.g.*, Chantal M.L.R. Brazeau et al., *Distress Among Matriculating Medical Students Relative to the General Population*, 89 Acad. Med. 1520, 1520 (2014); Liselotte N. Dyrbye et al., *Medical Student Distress: Causes, Consequences, and Proposed Solutions*, 80 Mayo Clin. Proc. 1613, 1613 (2005); Jane L. Givens & Jennifer Tjia, *Distressed Medical Students' Use of Mental Health Services and Barriers to Use*, 77 Acad. Med. 918, 918 (2002); Rohan Puthran et al., *Prevalence of Depression Amongst Medical Students: A Meta-Analysis*, 50 Med. Educ. Rev. 456, 456 (2016); Anna Rosiek et al., *Chronic Stress and Suicidal Thinking Among Medical Students*, 13 Int'l J. Envtl. Res. & Pub. Health 212, 212 (2016).

The prevalence of depression among medical students has important implications for medical schools.  A leading medical scholar has published an editorial in JAMA, one of the nation's leading and widely read medical publications, warning readers across the nation and in Des Moines that the well-being of medical students is an environmental health issue for our medical schools to confront.

Stuart J. Slavin, *Medical Student Mental Health: Culture, Environment, and the Need for Change*, 316 J. Am. Med. Ass'n 2195, 2195–96 (2016).

The need for medical schools to properly address depression among their students also has a legal dimension. Clearly, depression can be a disability covered by state and federal law. State and federal statutes prohibiting discrimination based on disability are meant to eliminate actions based upon prejudice and fear of disabilities and to prohibit responsible decision-makers from failing to make reasonable accommodations for a person's disabilities. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S. Ct. 1516, 1522–23 (2002) ("The [Americans with Disabilities Act (ADA)] seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life, including the workplace. These objectives demand unprejudiced thought and reasonable responsive reaction on the part of employers and fellow workers alike. They will sometimes require affirmative conduct to promote entry of disabled people into the work force." (Citation omitted.)). Thus, properly addressing known clinical depression of students in medical school through an interactive process and a search for reasonable accommodation is not simply a professional expectation. It is a legal requirement. Yet dealing with depression within the legal frameworks established by state and federal law is challenging in light of the pervasive stigma and animus directed toward psychiatric impairments. *See* Wendy F. Hensel & Gregory Todd Jones, *Bridging the Physical-Mental Gap: An Empirical Look at the Impact of Mental Illness Stigma on ADA Outcomes*, 73 Tenn. L. Rev. 47, 50–51 (2005); *see also* Susan Stefan,

*Delusion of Rights: Americans with Psychiatric Disabilities, Employment Discrimination and the Americans with Disabilities Act*, 52 Ala. L. Rev. 271, 271 (2000) (suggesting that individuals with psychiatric disabilities encounter difficulties in obtaining protection through the ADA from employment discrimination).

In this case, the parties concede a medical student at Des Moines University (DMU) suffered from severe depression. Her academic performance was below expectations. The question here is whether DMU, a school dedicated to the healing arts, took appropriate steps when it learned of her depression to reasonably accommodate her by adequately engaging in the required interactive process. Based on the record below, and stripping away our preconceived notions of depression as a less-than-valid disability, I conclude that DMU is not entitled to summary judgment on the plaintiff's failure-to-accommodate claim.

Here are the details.

## I. Factual and Procedural Background.

This case involves a challenge to the granting of summary judgment in a case where the plaintiff alleged a failure to accommodate a disability under the Iowa Civil Rights Act, Iowa Code chapter 216. The parties do not distinguish between the Iowa Civil Rights Act and the Federal Americans with Disabilities Act. Although we have held that we are free to interpret the Iowa Civil Rights Act differently from its federal counterpart, *see Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 604–15 (Iowa 2017) (Appel, J., concurring in part and dissenting in part); *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 9 (Iowa 2014), the parties do not draw any distinction between the statutes in this case. The parties simply conflate the two statutes. In light of the nature of the advocacy, we may regard the substantive standards of the

two statutes as identical. Nonetheless, in all cases under the Iowa Civil Rights Act, we must keep in mind the legislature's directive that the statute is to be broadly construed in light of its purposes.[7]

**II. Discussion.**

**A. Triggering the Interactive Process.** The first question we must confront is whether Natalie Slaughter's disclosures to DMU regarding her depression were sufficient to raise a triable issue on the question of whether she disclosed enough information to trigger an interactive process to determine if a reasonable accommodation might be available to address her disability. Based on the summary judgment record, I would answer that question in the affirmative.

The interactive process is integral to the developing legal framework of disability law. As one court explained,

> The interactive process is at the heart of the ADA's process and essential to accomplishing its goals. It is the primary vehicle for identifying and achieving effective adjustments which allow disabled employees to continue working without placing an "undue burden" on employers. Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has.

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1113 (9th Cir. 2000) (en banc), *vacated on other grounds by U.S. Airways*, 535 U.S. 391, 122 S. Ct.

---

[7]Nothing in this case should affect our ability to construe the disability provisions of the Iowa Civil Rights Act in a fashion different from federal courts applying federal disability law. Historically, the federal courts have interpreted disability law narrowly, ultimately triggering congressional intervention. As noted in *Goodpaster*, there is no reason we should be bound by the chains of narrow federal precedent. 849 N.W.2d at 9. This is particularly so in light of the explicit legislative directive that the Iowa Civil Rights Act is to be broadly construed in light its purposes. *Haskenhoff*, 897 N.W.2d at 607–10 (Appel, J., concurring in part and dissenting in part).

1516. In the area of disability law, the courts have consistently demanded that the parties seek to resolve the possible issues on their own through an interactive process rather than prematurely resorting to litigation with the prospect of an unpleasant, win or lose battle in the courts with post hoc rationalizations and finger pointing regarding who did what to whom and when.

The interactive process is triggered when the institution is aware of a disability and knows that the employee or student seeks a reasonable accommodation. *See Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (stating that an employer has a duty to engage in the interactive process if it knows or should know of the disability). Magic words are not necessary to trigger the interactive process. *See Barnett*, 228 F.3d at 1112; *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999); *Bultemeyer v. Ft. Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). If the disabled person does not know how to ask for an accommodation in so many words, the institution should do what it can to help. *Bultemeyer*, 100 F.3d at 1284–85. All that is required is that the institution be aware of enough information to know that the disabled party has both a disability and desires an accommodation. *See Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002); *Bultemeyer*, 100 F.3d at 1284–85. Particularly when addressing a mental health issue, it is simply not necessary that the disabled person point to specific accommodations. *Bultemeyer*, 100 F.3d at 1284–86.

Slaughter's December 17 email plainly put DMU on notice of Slaughter's disability. She eloquently wrote,

> I have struggled with depression for a very long time, and at the beginning of the semester [I] had a horrible relapse of sorts. My normally well controlled disorder ended up

severely affecting my life in ways it hasn't in many years. I was barely making it through the day without breaking down, and all the emotional energy it took for me to save face at school was so exhausting that by the time I would get home I had difficulty focusing on my coursework. I was extremely demoralized because of doing poorly it just ended up as this vicious cycle. There would be days where I couldn't get anything done and then I would get really behind, then crammed right before the test, do poorly, and then go right back into depression. I started seeing a therapist when I was about half of the way through biochem and as I have been working with her my mood has improved, making it easier for me to focus on school.

I knew going into medical school that 1st year would be the most difficult for me. A lot of the material is so foreign to me and it is requiring me to use different skills than what I am used to, which we did talk about in the meeting. . . . [M]y issue is finding the tools that work best for me and getting my depression under control . . . .

While Slaughter did not explicitly state "I want/need an accommodation" in the December 17 email, she made DMU aware of her disability and her need to find tools that work for her to get her depression under control.

It seems to me that the context of the December 17 email—a response to evolving concerns about Slaughter's academic performance—would sufficiently alert a reasonable institution to trigger an interactive process to explore possible steps to accommodate her. Obviously Slaughter advised DMU that she suffered from depression of a nature that affected life functions, and in context, a factfinder could reasonably interpret the letter as a plea for help. It is unfathomable to me that medical professionals would think otherwise.[8] As such, DMU cannot get summary judgment based on a failure to trigger the interactive process.

---

[8]In any case, as the district court recognized, DMU expressly states in its motion for summary judgment that it does not dispute that Slaughter requested accommodations.

**B. DMU's Engagement in the Interactive Process.** The next question is whether, on the undisputed facts, DMU adequately engaged in the interactive process. The answer to this question is no.

An interactive process—according to judicial, regulatory, and secondary authorities—requires a search for an appropriate accommodation that is specifically linked to the disability at hand. We have explained that once an institution learns of a disability, it has the burden to undertake an "individualized and extensive inquiry" into the disability and to attempt to provide specifically tailored accommodations. *Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n,* 850 N.W.2d 326, 337 (Iowa 2014). An educational institution "has a 'real obligation' to seek out 'suitable means of reasonably accommodating' individuals with disabilities and to submit 'a factual record indicating' it 'conscientiously carried out this statutory obligation.' " *Id.* (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25–26 (1st Cir. 1991)). Other courts note that in evaluating a breakdown in the interactive process, they look for signs of failure to participate in good faith or failure to help determine what specific accommodations are necessary. *Taylor,* 184 F.3d at 312; *Bultemeyer,* 100 F.3d at 1285. Another court explains that

> employers must consult and cooperate with disabled employees so that both parties discover the precise limitations and the types of accommodations which would be most effective. The evaluation of proposed accommodations requires further dialogue and an assessment of the effectiveness of each accommodation, in terms of enabling the employee to successfully perform the job.

*Barnett*, 228 F.3d at 1115.

The Equal Employment Opportunity Commission affirms the need for an interactive process tailored to an individual's disability. The

interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3) (2014). The commission advocates a four-step method for an employer to engage in the interactive process and emphasizes at each step the necessity of considering individualized circumstances:

> (1) Analyze the particular job involved and determine its purpose and essential functions;

> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

29 C.F.R. pt. 1630 app.

Secondary sources concur in the importance of considering individualized circumstances. One treatise explains that "[t]he process of identifying an appropriate reasonable accommodation requires an individual assessment of the particular job and the specific mental or physical limitations of the individual needing a reasonable accommodation." 2 Merrick T. Rossein, *Employment Discrimination Law and Litigation* § 23:45, Westlaw (database updated Dec. 2018). Other authors emphasize that the individualized response required of employers and other institutions distinguishes the interactive process from the requirements of other civil rights statutes. *See* PollyBeth

Proctor, *Determining "Reasonable Accommodation" Under the ADA: Understanding Employer and Employee Rights and Obligations During the Interactive Process*, 33 Sw. U. L. Rev. 51, 56 (2003) [hereinafter Proctor]; Craig A. Sullivan, *The ADA's Interactive Process*, 57 J. Mo. B. 116, 116 (2001). "[T]he employee and employer are required to come together at the bargaining table and ask probing questions to better understand the employee's disability and resultant limitations." Proctor, 33 Sw. U. L. Rev. at 54. That particularized inquiry "targets Congress' explicit concern in the ADA: discrimination motivated in large part by ignorance and unfounded bias on the employer's part." *Id.* at 55.

As a result of the need for an individualized interactive process, an offer of "standard" accommodations—without regard to the specific disability at issue—is not a reasonable accommodation. *Allen v. Interior Constr. Servs., Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000) ("[A]n accommodation is reasonable only if it is related to the accommodated individual's disability."); *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1297 (S.D. Fla. 2016); *see Barnett*, 228 F.3d at 1116–17 (explaining that one of the employer's offered accommodations was insufficient because "[t]hat a tool performs a similar function doesn't make it a proper tool for a particular job" and another offered accommodation was merely a recitation of "a right [the employee] already had"). Likewise, determining the accommodations one is willing to offer before engaging in the interactive process does not satisfy the requirements of the interactive process and cannot constitute reasonable accommodations. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 606 (6th Cir. 2018); *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004). An employer who simply offers generalized accommodations available to disabled and nondisabled

persons alike is not engaging in the interactive process. *Palmer*, 850 N.W.2d at 337–38.

The requirement that the interactive process focus on the *particular disability* is critical, particularly in cases involving mental health. It is true, of course, that Slaughter was not excelling academically, but the question is whether her difficulties in performance were a result of her disability, and thus might be subject to reasonable accommodation, or if the admission committee at DMU made a mistake and she lacked the ability to successfully complete the academic program at DMU.

The record here makes it clear that DMU offered Slaughter the kind of assistance available to all students having academic difficulty, but there is substantial evidence that DMU never specifically considered the precise nature of Slaughter's disability and how specific accommodations might be developed to address it. Instead, upon learning of the disability, DMU simply ignored it and stayed the course, proceeding as it would have proceeded with any nondisabled student. As a result, I conclude that Slaughter presented a triable issue on the question of whether DMU engaged in the interactive process required in a case involving a disability.

It is important to emphasize that it is not necessary that the disabled individual propose specific accommodations during the interactive process. The majority repeatedly observes that Slaughter did not request a specific accommodation refused by DMU that could have allowed Slaughter to continue her studies. But whether Slaughter requested a specific accommodation during the interactive process is

immaterial.[9]  As stated in *Taylor*: "[A]n employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation."  184 F.3d at 317. Slaughter need not have identified ex ante the reasonable accommodation that the interactive process could produce.  The *Taylor* court put an even finer point on it: "[I]t would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process." *Id.* at 316.  The United States Court of Appeals for the Ninth Circuit expounds on that point:

> Without the interactive process, many employees will be unable to identify effective reasonable accommodations. Without the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations.  The result would be less accommodation and more litigation, as lawsuits become the only alternative for disabled employees seeking accommodation.  This is a long way from the framework of cooperative problem solving based on open and individualized exchange in the workplace that the ADA intended.  Therefore, summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith.

*Barnett*, 228 F.3d at 1116.

**C. Consequence of Failure to Engage in the Interactive Process in Context of Defendant's Motion for Summary Judgment to Extinguish Claim.**  The final question we must confront is the

---

[9]As further discussed below, some courts require a plaintiff—during litigation—to identify a possible accommodation to avoid summary judgment.  *See, e.g., McMillan v. City of New York*, 711 F.3d 120, 127–28 (2d Cir. 2013).  Whatever the merits of that requirement, it is significantly different from requiring a disabled person to request—during the interactive process—a specific accommodation refused by the institution that could have allowed the person to continue working or studying.

ramification of DMU's failure to engage in the interactive process for purposes of summary judgment. I discuss three possible approaches. One approach holds that an institution's motion for summary judgment must be denied when the institution does not present undisputed facts showing that it adequately engaged in the interactive process. A second approach would deny summary judgment to an institution unless it presents undisputed facts demonstrating that engagement in an interactive process could not have produced a possible accommodation.

The third approach is a burden-shifting approach. In response to a motion for summary judgment by an institution, a plaintiff must identify a facially plausible accommodation that could have resulted from the interactive process. At that point, summary judgment is denied unless the institution presents undisputed facts that the student could not perform even with the facially plausible accommodation or that accommodating the student would pose an undue hardship.

Under any approach, our determination must rest on the Iowa summary judgment standard. I conclude that the present record precludes granting summary judgment in favor of DMU under any of these theories.

1. *Iowa summary judgment standard.* On review of a summary judgment grant, "[w]e examine the record to determine whether a material fact is in dispute." *Schneider v. State*, 789 N.W.2d 138, 143 (Iowa 2010); *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010); *accord Minor v. State*, 819 N.W.2d 383, 393 (Iowa 2012); *Gen. Car & Truck Leasing Sys., Inc. v. Lane & Waterman*, 557 N.W.2d 274, 276 (Iowa 1996). Iowa courts must "view the entire record in the light most favorable to the nonmoving party." *Bass v. J.C. Penney Co.*, 880 N.W.2d 751, 755 (Iowa 2016); *accord Veatch v. City of Waverly*, 858 N.W.2d 1, 6

(Iowa 2015); *Crippen v. City of Cedar Rapids*, 618 N.W.2d 562, 565 (Iowa 2000). And the court must "consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record." *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 20 (Iowa 2012) (quoting *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 692 (Iowa 2009)); *accord Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677 (Iowa 2004) (quoting *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717–18 (Iowa 2001)). "We . . . indulge in every legitimate inference that the evidence will bear in an effort to ascertain the existence of a fact question." *Crippen*, 618 N.W.2d at 565.

> Summary judgment is appropriate
>
> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 1.981(3); *Banwart v. 50th Street Sports, L.L.C.*, 910 N.W.2d 540, 544 (Iowa 2018). "Even if the facts are undisputed, summary judgment is not proper if reasonable minds could draw different inferences from them and thereby reach different conclusions." *Banwart*, 910 N.W.2d at 544–45 (quoting *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005)).

In Iowa, unlike the federal courts,[10] the burden of showing undisputed facts entitling the moving party to summary judgment rests

---

[10]Under federal law, when the nonmoving party bears the burden of proof at trial on a dispositive issue, the summary judgment movant's burden of production "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). Such a motion is considered properly made under federal law whether or not accompanied by affidavits, and will thus require the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

with the moving party. *Swainston v. Am. Family Mut. Ins.*, 774 N.W.2d 478, 481 (Iowa 2009). The burden of proof remains with the moving party at all times. *See Interstate Power Co. v. Ins. Co. of N. Am.*, 603 N.W.2d 751, 756 (Iowa 1999). A moving party cannot shift the burden to the other party through a conclusory motion for summary judgment not supported by undisputed facts. *See id.*; *Midwest Mgmt. Corp. v. Stephens*, 291 N.W.2d 896, 900 (Iowa 1980); *Am. Tel. & Tel. Co. v. Dubuque Commc'ns Corp.*, 231 N.W.2d 12, 14–15 (Iowa 1975). Our caselaw on this question is clear:

> To obtain a grant of summary judgment on some issue in an action, the moving party must affirmatively establish the existence of undisputed facts entitling that party to a particular result under controlling law. . . .
>
> . . . When the evidentiary matter tendered in support of the motion does not affirmatively establish uncontroverted facts that sustain the moving party's right to judgment, summary judgment must be denied even if no opposing evidentiary matter is presented.

*Griglione v. Martin*, 525 N.W.2d 810, 813 (Iowa 1994), *overruled on other grounds by Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 443, 446 (Iowa 2016). Where a motion for summary judgment is not adequately supported, "we need not consider the sufficiency of plaintiff's resistance to the motion." *Id.* In this way, we do not follow the federal *Celotex* standard for summary judgment.[11] *Id.*

---

showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S. Ct. at 2553 (citation omitted).

[11]Iowa is not the only state to reject the federal *Celotex* approach to summary judgment. *See, e.g.*, *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1995); *Minnie v. City of Roundup*, 849 P.2d 212, 214 (Mont. 1993); *see also* Zachary D. Clopton, *Procedural Retrenchment and the States*, 106 Calif. L. Rev. 411, 429–31 (2018) (citing fourteen states that reject *Celotex* in whole or in part). The impact of *Celotex* is notable on cases brought under civil rights statutes. *See* Ann C. McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA Cases*, 34 B.C. L. Rev. 203, 206 (1993) (explaining that *Celotex* has eroded the factfinder's role in discrimination cases and substantially

2. *Denial of summary judgment for failure to engage in the interactive process.* Several courts have denied summary judgement to an employer or institution where the record showed a triable question on whether that party failed to adequately engage in an interactive process. *Barnett,* 228 F.3d at 1116 (collecting cases); *Taylor,* 184 F.3d at 318. This approach has the effect of requiring an employer or institution to engage in an interactive process as a prerequisite to summary judgment. The reluctance to grant summary judgment in a reasonable accommodation case where there is a triable issue on whether there was an adequate interactive process is particularly strong in cases involving disabilities that are heavily stigmatized in our society. *Taylor,* 184 F.3d at 318. In settings involving mental health, courts should be especially wary on summary judgment of underestimating how well a disabled person may perform with accommodations or how much the bad faith arising from the failure to engage in the interactive process may have hindered the process of finding an accommodation. *Id.*

Slaughter avoids summary judgment under the *Barnett/Taylor* approach if DMU has not shown undisputed facts that it engaged in an interactive process. *Griglione,* 525 N.W.2d at 813. Because DMU failed

---

undermined the efficacy of antidiscrimination laws). For critical criticism of *Celotex* generally, see Samuel Issacharoff & George Loewenstein, *Second Thoughts About Summary Judgment,* 100 Yale L.J. 73, 75 (1990) (noting that the United States Supreme Court's approach to summary judgment results in a wealth transfer from plaintiffs as a class to defendants as a class); Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?,* 78 N.Y.U. L. Rev 982, 1044–48 (2003) (questioning *Celotex* in light of "negative effects on other system values, such as accuracy, fairness, the day-in-court principle, and the jury trial right"); and Martin H. Redish, *Summary Judgment and the Vanishing Trial: Implications of the Litigation Matrix,* 57 Stan. L. Rev. 1329, 1330 (2005) (suggesting a causal connection between changes in the law of summary judgment and the dramatic decline in federal trials).

to engage in the interactive process, DMU is not entitled to summary judgment under *Barnett*, 228 F.3d at 1116, and *Taylor*, 184 F.3d at 318.

3. *Denial of summary judgment for failure to show that an interactive process would not have identified a reasonable accommodation.* A more defendant-friendly standard would allow a defendant that failed to engage in the interactive process to obtain summary judgment if it can present undisputed facts demonstrating that the interactive process would not have produced a reasonable accommodation. Under this approach, the question under the Iowa summary judgment standard is this: Did DMU, as the summary judgment movant, offer undisputed facts demonstrating there was no possible accommodation to allow this apparently bright (she was admitted to medical school) but disabled student to satisfactorily continue her studies?

In its materials in support of its motion for summary judgment, DMU does not present this material fact as not subject to genuine dispute. Nor does DMU present any evidence that the interactive process would have been futile. For that reason, DMU's summary judgment motion must fail. *See Griglione*, 525 N.W.2d at 813.

Indeed, the record shows that DMU cannot assert that no reasonable accommodation could have come from an interactive process. According to undisputed facts in the record, engagement in the interactive process would have entirely "changed the nature of the conversation" and could have produced at least two potential accommodations.

To begin with, it is undisputed that had Dr. Canby known of Slaughter's disability, the whole affair would have taken a different course. Further, Dr. Canby suggested that, among other things, a

medical leave would have been considered. The record reveals the following questions and answers:

> Q. So Natalie's [Slaughter's] depression was never discussed between you and her when you met to do the action plan because you did not know it. A. That's correct. It would have changed the nature of the conversation.

> Q. It would have changed the nature entirely, would it not? A. It would have.

> Q. You would have advised her to go to seek accommodation, would you not? A. I would have discussed the medical leave of absence as well.

Notably, Dr. Canby did not testify that knowledge of Slaughter's depression did not matter (the position taken by DMU in this litigation), and did not testify that there would have been no solutions had he known about the depression. Instead, he came up with at least one possible accommodation, medical leave, and admitted that the discussions would have taken an entirely different course had he known of the depression. This candid testimony undermines DMU's current white-knuckled position that there was simply nothing that could be done to accommodate the plaintiff's disability.

What would the entirely different conversation look like? We don't know for sure, but the inference is that Dr. Canby, at least, considered it at least possible that there would be accommodations available for Slaughter to see her through her depression. On summary judgment, we consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record. *Crippen,* 618 N.W.2d at 565; *see also Smith v. Shagnasty's Inc.,* 688 N.W.2d 67, 71 (Iowa 2004) ("An inference is legitimate if it is 'rational, reasonable, and otherwise permissible under the governing substantive law.'" (quoting *McIlravy v. N. River Ins.,* 653 N.W.2d 323, 328 (Iowa 2002))). Dr. Canby did not say

that the depression made no difference and that he would have acted the same in any event. Indeed, Dr. Canby stated that had he known about the depression, he would have discussed a medical leave of absence "as well" as other possibilities. Other courts have noted that finite leaves of absence can be a reasonable accommodation. *See, e.g., Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1136 (9th Cir. 2001); *García-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 649–50 (1st Cir. 2000); *Cehrs v. Nw. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781–83 (6th Cir. 1998); *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998); *see also* 29 C.F.R. pt. 1630 app. (providing that a reasonable accommodation could include "unpaid leave for necessary treatment"). At least one court has vacated a grant of summary judgment upon determining that a leave of absence from medical school can be a reasonable accommodation for a student suffering from depression. *Dean*, 804 F.3d at 190–91. Further, the record does not present undisputed facts to show (1) that Slaughter would not have accepted the medical leave or (2) that she would not have been successful with the medical leave.

In addition, there is reason to believe that something could, in fact, be done short of dismissal or even short of a medical leave. In terms of her academic performance, the record shows that at the time of her dismissal from DMU, her grade point was 2.19. This reflected her remediated grade in biochemistry. Further, if she had been allowed to remediate her physiology class and raised her grade to a C as she did in biochemistry, her grade point would have exceeded 2.4. There is no evidence in the record that DMU routinely discharged students receiving Bs and Cs in the academic program or considered persons with Bs and Cs unqualified to continue their studies. Plainly, this is not the kind of

evidence that supports a claim that it is *undisputed* that the interactive process would have ultimately failed.

The majority observes that Slaughter did not request an academic withdrawal or medical leave while a student at DMU. That may be true, but it is immaterial to the question before us. So too would a failure to request remediation of physiology be immaterial. As noted above, Slaughter had no duty to make the requests as part of the interactive process. And in this litigation, it is DMU's burden to offer undisputed facts showing that there was no possible accommodation to allow Slaughter to satisfactorily continue her studies. DMU cannot meet that burden, because Dr. Canby admits that medical leave is a possible accommodation and the record shows that remediation already worked for Slaughter once.

4. *Denial of summary judgment under burden-shifting approach.* Finally, it is worth emphasizing that Slaughter would survive summary judgment even under a similar—but distinguishable—approach taken by some federal courts. A series of federal decisions impose a burden on the employee or student to suggest—during litigation—a possible reasonable accommodation for the disability. *U.S. Airways*, 535 U.S. at 401–02, 122 S. Ct. at 1523 (noting that "[m]any of the lower courts" hold that, to defeat summary judgment, a plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases"); *McMillan v. City of New York*, 711 F.3d 120, 127–28 (2d Cir. 2013) (stating that, to avoid summary judgment, a plaintiff must suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits); *Fenney v. Dakota, Minn. & E. R.R.*, 327 F.3d 707, 712 (8th Cir. 2003) ("[H]e must only make a 'facial showing that a reasonable accommodation is *possible*.' " (quoting *Benson*

*v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995)). If the employee or student makes such a showing, the burden shifts to the employer or institution to show that the employee or student could not perform even with the reasonable accommodation or that accommodating the employee or student would pose an undue hardship. *U.S. Airways*, 535 U.S. at 402, 122 S. Ct. at 1523; *Dean v. Univ. at Buffalo Sch. of Med. & Biomed. Scis.*, 804 F.3d 178, 190 (2d Cir. 2015); *Fenney*, 327 F.3d at 712. I would not adopt the burden-shifting approach, but would leave the burden squarely with the moving party.

Yet here, the record shows that "the nature of the conversation" would have "changed . . . entirely" had DMU engaged in the interactive process. The record further reflects at least two possible accommodations that could have arisen from that process, medical leave and remediation. On review of a summary judgment grant, "[w]e examine the *record* to determine whether a material fact is in dispute," *Schneider*, 789 N.W.2d at 143 (emphasis added); *Ranes*, 778 N.W.2d at 685; *see Minor*, 819 N.W.2d at 393, and "consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the *record*," *Bagelmann*, 823 N.W.2d at 20 (emphasis added). The burden would then shift to DMU to show that either Slaughter could not perform even with the accommodations or accommodation would pose an undue hardship, *U.S. Airways*, 535 U.S. at 402, 122 S. Ct. at 1523; *Dean*, 804 F.3d at 190; *Fenney*, 327 F.3d at 712, and it has offered no such evidence. Consequently, Slaughter avoids summary judgment under that federal approach. The majority is mistaken in concluding otherwise.

### III. Conclusion.

It must be remembered that this case involves a motion for summary judgment. As I have stated, the moving party has the burden

of presenting undisputed facts that entitle the party to relief as a matter of law. *Swainston*, 774 N.W.2d at 481; *Interstate Power Co.*, 603 N.W.2d at 756. There was no interactive process, thereby giving rise to a presumption of bad faith. *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000).

Could there have been a reasonable accommodation for Slaughter that would have allowed her to continue her studies if DMU had engaged in the interactive process? The record suggests maybe. On the record before us, we simply do not know whether Slaughter was a brilliant and able student disabled by her depression but capable of meeting standards through appropriate accommodation or whether there was simply no way for her to satisfactorily complete her medical studies regardless of reasonable accommodations that might be offered. As a result, the undisputed facts do not entitle DMU to summary judgment. I would reverse the district court's grant of summary judgment in this case. Of course, I express no views on the ultimate outcome of this litigation, but only that DMU has not met the demanding standards for summary judgment in this case.

Cady, C.J., and Wiggins, J., join this dissent.